**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SecureNet Solutions Group, LLC, | |
| Plaintiff, | Case No. 1:26-cv-1149 |
| v. | |
| Siemens Industry, Inc., | |
| Defendant. | |

**COMPLAINT FOR PATENT INFRINGEMENT**

This is an action for patent infringement arising under the Patent Laws of the United States of America, 35 U.S.C. § 1 *et seq*. Plaintiff SecureNet Solutions Group, LLC (the "Plaintiff" or "SecureNet") sues Defendant Siemens Industry, Inc. (the "Defendant" or "Siemens") for patent infringement via its unauthorized manufacture, use, offers to sell, sale, or importation of Plaintiff's patented invention within and into the United States of various video analytics solutions. Siemens offers and sells technologies for profit that are protected by, and infringe upon Patents owned by SecureNet, including but not limited to, U.S. Patent Nos. 7,737,837 (claim 1), 8,130,098 (claim 13), 8,354,926 (claim 34), 9,344,616 (claim 48), 9,619,984 (claim 22), 11,323,314 (claim 13), and 11,929,870 (claim 6) (the "Asserted Patents").

Siemens' infringing products include, but are not limited to: Siemens Siveillance Suite, which includes Siveillance Control or Siveillance Control Pro used

with Siveillance Video Advanced or Siveillance Video Pro. (collectively, the "Accused Product").

## I. Parties

1. Plaintiff SecureNet Solutions Group, LLC is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business at 3427 Bannerman Road, Suite D208, Tallahassee, Florida 32312.

2. On information and belief, Defendant Siemens Industry, Inc. is a company, incorporated under the laws of Delaware with its principal place of business and headquarters at 1000 Deerfield Parkway, Buffalo Grove, IL 60089.

## II. Jurisdiction and Venue

3. This action arises under the Patent Laws of the United States, Title 35 of the United States Code. The Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4. This Court has personal jurisdiction over Defendant. On information and belief, Defendant conducts business, has committed acts of patent infringement, and has induced acts of patent infringement by others in this District and elsewhere in the United States. On information and belief, Siemens places, has placed, and contributed to placing its products into the stream of commerce through established distribution channels knowing or understanding that such products would be sold and used in the United States, including in this District.

5.     Venue is proper in this district under 28 U.S.C. § 1400(b) because Siemens resides in Northern Illinois, has its principal place of business in Northern Illinois, and is subject to the Court's personal jurisdiction with respect to this action. Venue is proper in this division because Siemens resides and conducts business, including the infringing activity, in Cook County, Illinois.

### III.    The Background of the Asserted Patents

6.     The claims of the Asserted Patents address a need arising specifically within the field of computerized security systems. The inventions were conceived after a three-day workshop with CLEMIS, the IT Department for the Oakland County, Michigan confederation of police department - the largest confederation of police departments in the country. During the workshop, the police described several major problems with known police IT systems. In 2007 (the priority date for the Asserted Patents), smart surveillance systems gained commercial adoption and started to replace traditional security systems, causing challenges for large-scale data analysis. *See e.g.,* Lisa Brown, Arun Hampapur, Jonathan Connell, Max Lu, Andrew Senior, Chiao-Fe Shu, Yingli Tian, IBM Smart Surveillance System (S3): *An open and extensible architecture for smart video surveillance*, IBM T.J. Watson Research Center, Proceedings of the IEEE Conference on Advanced Video and Signal Based Surveillance, AVSS 2005, Sept. 15-16, 2005.

7.     The claims of the Asserted Patents disclose technical solutions to some challenges, such as reducing errors and false positives via a particular computerized process. In particular, the inventors conceived of systems and methods for using

integrated cameras, sensor networks, and other data sources with a correlation engine that correlates two or more events weighted by the attribute data of the data sources. Such correlations could effectively connect crime-related events to specific sensor data, other legacy system data, 911 calls, anonymous tips, and video records.

8. A high-level depiction of one embodiment of the invention is illustrated in Figure 1 of the U.S. Patent No. 9,344,616 (the "'616 patent")[1]:



'616 patent, Fig. 1.

9. In the embodiment in Figure 1, various types of security-related data are collected from various sources, such as video cameras and other sensory devices, a video tip system, a card access system, a personnel system, and a vehicle

[1] For ease of reference, all citations are to the '616 patent. All Asserted Parents are related and have the same *Specification*.

information module. '616 patent at 5:31-6:38. These data describe "primitive events," which are "atomic, indivisible event[s] from any subsystem," such as people entering a designated area, a vehicle driving the wrong way in a designated lane, a package left behind in an area, a person screaming, glass breaking, or a gunshot. '616 patent at 4:4-11.

10.     The primitive events are then normalized by the normalization engine. '616 patent at 6:21-28. The normalization engine normalizes the primitive events into a "normalized event 115," which is in "a standardized format the system can recognize." '616 patent at 6:50-53. The specification points out that "each type of sensory device may have its own normalization engine." '616 patent at 6:54-55. Alternatively, "one normalization engine as shown in FIG. 1 may have multiple modules for each type of sensory device." '616 patent at 6:61-63.

11.     In the described embodiment, "[n]ormalized events 115 are placed in event queue 116 for processing by correlation engine 117." '616 patent at 7:1-3. The basic function of the correlation engine is to "correlate[] two or more primitive events, combinations of primitive events and compound events, and combinations of compound events." '616 patent at 7:15-17. Carrying out this function is quite complex. Figure 2 shows how the correlation engine works in one embodiment of the invention:



'616 patent at Fig. 2 (rotated).

12.     As described by the specification, the correlation engine receives normalized events from the normalization engine. '616 patent at 7:53-57. These normalized events are then filtered by a privacy filter, which applies a set of privacy rules defined by a system administrator. '616 patent at 7:58-60. For example, a privacy rule may instruct the system to ignore all primitive events between certain time periods, or to disregard other categories of data. '616 patent at 7:64-8:6.

13.     After applying the privacy filter, the correlation engine applies the business filter, which applies a set of business rules set by a system administrator. '616 patent at 8:14-18. The objective of the business filter is to "eliminate [] unnecessary false alarms by disregarding events when they are not significant based on normal business processes." '616 patent at 8:26-28. For example, in a

security system designed to guard a data center, a business filter could be configured to ignore primitive events taking place during hours when the data center is scheduled to be serviced. '616 patent at 8:22-26.

14.     After the correlation engine has filtered primitive events based on the privacy and business rules, it evaluates the remaining primitive events for the presence of "compound events"—events that are composed of one or more primitive events. '616 patent at 4:36-38; 8:29-32. An example of a compound event is tailgating (i.e., where two or more persons enter a designated area as detected on the video data using a person-counting algorithm, when only one corresponding swipe/access card is detected by the legacy access control system). '616 patent at 8:34-38. Compound events "may include primitive events from one sensor, from two or more sensors, or even from two disparate types of sensors." '616 patent at 8:40-43.

15.     Next, the correlation engine uses an event correlation module 210 to correlate both the primitive and compound events across geographical space. '616 patent at 8:44-46. For example, the correlation engine may identify multiple tailgating events in different parts of a facility, or the loitering of two different vehicles in different parts of a campus. '616 patent at 8:50-52. The event correlation module 212 correlates events across time, by comparing events detected presently with events detected in the past. '616 patent at 8:52-56. Examples include detection of the presence of the same individual allowing another to tailgate at different

times, or the same person loitering or being stopped multiple times by security. '616 patent at 8:56-61.

16.     The event correlation modules' 210 and 212 correlation of primitive and/or compound events over either space or time produces a new data type: correlated events. '616 patent at 4:42-44.

17.     As shown in Figure 1, the correlation engine 117 receives input from events database 118 and configuration databases 119 that include sensor attributes and rules and its outputs to alert/action engine. '616 patent at 7:10-15,2-26.



18.     As shown in the embodiment in Figure 2, the correlation engine 200, directs storage of the compounded and correlated events into the events database.

*Fig. 2*



In other words, at each detection of a compound event by compound event detection

module 208, and each correlation across both space and time by event correlation

modules 210 and 212, the events and correlated events are stored in events

database 118. Rule evaluation module 214 then evaluates a set of rules from rules

database 216 based on the events stored in events database 118. '616 patent t 8:62-

9:1.

19.     The correlation engine's forensic analysis of events, including how to

calculate a weight for a particular attribute, is depicted in even greater detail in

Figure 10 of the specification:



'616 patent, Fig. 10. Figure 10 depicts various sets of video data (i.e., $V_1$ through $V_i$; the large circles in the first column), with each subset (any of the rows) corresponding to data obtained from a particular video camera. '616 patent at 30:66-31:7. The dashed circles inside the larger circles ($V_1$ through $V_i$ in the first column) each represent a subset of video data from a particular camera. *Id.*

20.    Figure 10 also depicts various sets of metadata (i.e., $M_1$ through $M_i$; the large circles in the second column).'616 patent at 31:8-9. Each set of metadata is indexed and points to at least one set of video data. '616 patent at 31:9-17. In Figure 10, each set of metadata corresponds to one and only one set of video data, but the specification is clear that the relationship between metadata and video data may be one-to-many, many-to-one, as well as many-to-many (i.e., a particular video data has metadata for location and frame rate). '616 patent at 31:17-21.

21.    Finally, Figure 10 depicts various sets of attribute weight data (i.e., $W_1$ through $W_i$; the large circles in the third column). '616 patent at 31:22-24. The sets

of attribute weight data "are sets of vectors … which represent weights associated with subsets of the metadata $M_i$." '616 patent at 31:24-26. These weights may be multi-dimensional. '616 patent at 31:28-31. For example, a two-dimensional weight may represent the attribute weights associated with (i) the reliability of a particular video camera for motion detection reliability; and (ii) the reliability of that camera for gunshot detection reliability. '616 patent at 31:31-35. This would enable the system to account for the fact that a camera might have high motion detection reliability and low gunshot detection reliability, or vice-versa. '616 patent at 31:38. The specification provides an illustrative equation that can be used for determining weighted attribute data for a particular sensor:

$$w_i = \sum_{k=1}^{N} \omega_k a_k$$

'616 patent at 34:35-57. In this equation, "[t]he weights "$w_i$" may be a weighted average of attribute data ($a_i$)." '616 patent at 34:36-43. The symbol "$\omega_k$" refers to relative weights of the attributes ($a_k$), "which are themselves weights associated with the data sources." '616 patent at 34:55-57.

22. The specification further discusses how attribute weights may be recalculated to yield the weighted attribute data of (i) two or more events occurring substantially simultaneously, or (ii) any of two or more events occurring substantially simultaneously. '616 patent at 33:31-54. Respectively, the formulae are as follows:

11

(i) $W(M_1 \cap M_2) = W(M_1) \cdot W(M_2)$

(ii) $W(M_1 \cup M_2) = W(M_1) + W(M_2) - W(M_1) \cdot W(M_2)$

*Id.*

23.     The specification provides several tables important to the correlation modules function. The meta-data parameters table (Table 1) describes the primitive and compound events that are detected and recorded by the present system and their associated parameters. The meta-data types table (Table 2) defines the primitive event types that may be detected and recorded, defines the composition of compound events, and assigns absolute values (used by the correlation engine) to the meta-data types. The events table (Table 3) is an important database used by the correlation engine and stores the actual primitive and compound events that were detected, as well as an index into the corresponding video data. The sources table (Table 4) defines the various devices (including sensory devices), and their associated attributes and weights, and is the core database used by the correlation engine, network management module, and the HSM module. The rules table (Table 5) defines the rules defining the alerts and alert conditions used by the alert/action engine. '616 patent at 18:60-19-9.

24.     As the compound events and correlated events are detected, the correlation module stores them in the events database 118. '616 patent at 8:62-66. The data may be stored in an events table such as the following:

TABLE 3

Events table

| MDEntry ID | MDParameter ID | MD_Event_DateTime | MD_Event_Duration | SrcID | Src_Description | Src_Location |
|---|---|---|---|---|---|---|
| . . . | . . . | . . . | . . . | . . . | . . . | . . . |
| 432 | 6 | 09/27/2007 7:05:24 PM | 1:05 | 1 | Camera 1 | Lobby |
| 433 | 16 | 09/27/2007 7:10:18 PM | 0:01 | 1 | Camera 1 | Lobby |
| 434 | 11 | 09/27/2007 8:13:08 PM | 0:01 | 9 | Card Reader in Server Room | Server Room |
| 435 | 10 | 09/27/2007 8:13:10 PM | 0:02 | 4 | Camera 34 | Server Room |
| 436 | 10 | 09/27/2007 8:13:14 PM | 0:02 | 4 | Camera 34 | Server Room |
| 437 | 12 | 09/27/2007 8:13:24 PM | 0:06 | 4 | Camera 34 | Server Room |
| 438 | 14 | 9/27/2007 9:05:00 PM | 0:26 | 23 | Registered Student | Off-campus (River St.) |
| 439 | 15 | 9/27/2007 9:14:04 PM | 0:10 | 2 | Camera 2 | Parking Lot |

'616 patent at Table 3, 21:54-22:20. Table 3 shows an illustrative events table, which corresponds to item 118 in Figures 1, 2, 4 and 5. '616 patent at 21:54-55. Here, the column "MDEntryID" contains the unique identifiers of the events. '616 patent at 21:57-58. "MDParameterID" refers to the types of events that were detected, which are fully described in a separate Metadata parameters table, i.e., Table 1. '616 patent at 21:58-60.

25. An example of a Metadata parameters table, which stores the various primitive and compound events that are detected and recorded by the present system and their associated parameters, is as follows:

TABLE 1

| | | | | | |
|---|---|---|---|---|---|
| Meta-data parameters table | | | | | |
| MDParameters ID | Nickname | MDType ID | SrcID | MD_TimeStart | MD_TimeEnd |
| 6 | Motion in Camera 1 | 1 | 1 | 17:00 | 8:00 |
| . . . | . . . | . . . | . . . | . . . | . . . |
| 10 | Person Enters Server Room | 23 | 4 | 0:00 | 23:59 |
| 11 | Swipe Card Detected to Server Room | 22 | 9 | 0:00 | 23:59 |
| 12 | Tailgating | 24 | 4 | 0:00 | 23:59 |
| 13 | Anonymous Video Tip | 98 | 22 | 0:00 | 23:59 |
| 14 | Registered Student Video Tip | 98 | 23 | 0:00 | 23:59 |
| 15 | Stolen Plate | 99 | 2 | 17:00 | 8:00 |
| 16 | Camera 1 loses connection | 105 | 1 | 0:00 | 23:59 |

'616 patent at Table 1, 19:30-20:46. Here, the "MDParametersID" column contains

the unique identifiers of the metadata parameter. '616 patent at 19:33-34, and

"MDTypeID" refers to the Metadata types, which are fully described in a separate

Metadata types table, i.e., Table 2. '616 patent at 19:35-37 and Table 2, 20:64-21:32.

The "SrcID" column refers to the Sources table, i.e., Table 4, which describes the

devices (such as video cameras and card readers) used by the correlation engine.

'616 patent at 19:37-39 and Table 4, 23:48-24:17. The specification provides a

number of examples to illustrate the functionality of the Metadata parameters table

and its relationship among the other tables. One example is as follows:

> For example, the row "MDParametersID=6" corresponds to an event
> with a nickname "Motion in Camera 1." This event has "MDTypeID=1",
> which by examining Table 2 corresponds to a motion event. It has
> "SrcID=1", which by examining Table 4 corresponds to Camera 1 located
> in a lobby. Based on "MD_TimeStart" and "MD_TimeEnd", this event is
> only being monitored and recorded between the hours of 5:00 PM (17:00)
> and 8:00 AM (8:00) to protect privacy or to follow a business rule.

'616 patent at 19:42-50.

26.     When the rule evaluation module 214 retrieves the events in the events database, it does so in accordance with a set of rules from a rules database 216. '616 patent at 8:66-9:1. An exemplar Rules table from the rules database is depicted as follows:

TABLE 5

| | | | | Contact | |
|---|---|---|---|---|---|
| RuleID | Nickname | MDParamterID | ThresholdValue | ID | MsgTxt |
| 1 | Alert 1 | 6 | null | 4 | Motion in lobby during forbidden hours |
| 2 | Tailgating SR | 12 | null | 1 | Tailgating in server room |
| 3 | Global Alert | null | 61 | 7 | Null |
| 4 | Stolen Plate | 15 | null | 2 | Stolen plate detected in parking lot |
| 5 | Camera 1 goes down | 16 | null | null | Camera 1 has lost connection! |

'616 patent Table 5 at 26:62-64. An exemplar description of an alert defined in Table 5 is provided by the specification:

> In the sample Rules table shown in Table 5, "AlertID" is a primary key uniquely identifying each rule, "Nickname" provides a nickname for each rule, "MDParameterID" specifies which event (including primitive or compound events) that triggers the alert (or null if a system-wide alert), "ThresholdValue" specifies a threshold value which triggers an alert (for correlated system-wide alerts, or null if an event-based alert), "ContactID" specifies the group, or individual, that will receive the alert, or the set of actions that will be triggered by the alert, and "MsgTxt" specifies the text of the message sent on an alert. "ContactID" is a foreign key into another table (not shown) that specifies the list of recipients or the list of actions to be performed when the alert corresponding to "ContactID" is triggered.

'616 patent at 27:6-19.

27.    The above description of the database tables is only a summary. The specification's "Database Design" section describes in great detail these and various other database tables, as well as the relationships among them. '616 patent at Tables 1-7; 18:51-58.

28.    Based on the evaluation of rules by the rule evaluation module 214, the correlation engine issues alerts or performs other appropriate actions. '616 patent at 9:3-5. These alerts may be issued in real-time in response to the correlation exceeding a particular threshold. '616 patent at 33:55-34:6. Sets of specific conditions may also be specified, and alerts and other actions can be configured to be triggered only when a certain set of conditions are met. *Id.*

29.    Further, actions can be configured to be triggered based on "accumulated value of multiple events across space and time." '616 patent at 34:7-10. Although the specification provides that various equations may be used, it provides three examples of such equations:

$$a_1: \sum_{i=1}^{i=N} w_i \cdot x_i + \sum_{i=1}^{m} w_i \cdot v_i \geq \tau_1$$

$$a_2: \sum_{i=1}^{i=N} w_i \cdot x_i + \sum_{i=1}^{m} w_i \cdot v_i \geq \tau_2$$

$$\ldots$$

$$a_n: \sum_{i=1}^{i=N} w_i \cdot x_i + \sum_{i=1}^{m} w_i \cdot v_i \geq \tau_n$$

'616 patent at 34:10-34. In these equations, "a" indicates an action, "w" indicates attribute weights, "x" indicates non-video events, and "v" indicates video events. '616 patent at 34:14-16. In Eq.20, the first example above, action component $a_1$ will be

activated if the expression on the left-hand side is greater than a predetermined threshold $\tau_1$. '616 patent at 34:11-14. These equations "could represent a hierarchy of actions that would be activated for different threshold scenarios." '616 patent at 34:16-18.

30. The Asserted Patents also describe a Hierarchical Storage Manager (HSM) for intelligent storage of large volumes of data created by security and surveillance applications. '616 patent at Figure 4; 3:15-17; 6:39-49; 10:54-11:36; 13:36-47.



'616 patent at Figure 4 (rotated). The HSM resolves a problem that arises from the sheer volume of sensor data in smart surveillance systems. '616 patent at 11:3-14. Routine operation of the sensors in the claimed invention generate large amounts of data. '616 patent at 10:55-67. "For example, a typical 3-Mega-pixel digital surveillance camera generates images of approximately 280 Kbytes per second per frame. If the camera were running at 5 frames per second, it would generate approximately 60 GB per day. . . In a typical application having 100 surveillance cameras around a particular facility, this translates to 6 TB per day… or approximately 2,000 TB per year!" *Id.* "Ideally, requested data should be retrieved at the fastest rate and this is possible only if all of the data is available on high-speed devices at all the time, but this is beyond the ability of most organizations." '616 patent at 10:67-11:3. HSM enables data to be moved from a faster storage medium (like cache) to a slower storage medium (such as tape). '616 patent at 11:6-14. One of the benefits of Hierarchical Storage is that "performance is improved as unused data is moved to lower level storage devices and frees up higher level (faster) storage devices, thus increasing overall system performance." '616 patent at 11:25-28. The Patent discloses particular ways of "cascading" storage. *See, e.g.*, '616 patent at 11:55-56; 12:55-58; 13:1-17; 37:5-15.

31.     One embodiment is illustrated by video data. '616 patent at 11:55-12:33. A video data segment is stored by its importance ("Y"), which may be calculated as weighted attributes of the data (including attributes of the camera). '616 patent at 11:55-59. Such attributes include resolution of the data ("R"); age of

camera ("A"); time since last maintenance on camera ("TM"); location of camera ("L"); reliability of the source (such as whether derived from a "video tip") ("RS"); time since video was last accessed ("TS"); time when video was recorded; and the type of event detected, such as whether the data includes a "primitive event," along with attributes of the data. '616 patent at 11:61-12:9. A "primitive event" is an "atomic, indivisible event[s] from any subsystem," such as people entering a designated area, a package left behind in an area, a gunshot detected, a count of the number of cleaning people entering a building at a certain time, locks on gates not engaged, and so on. '616 patent at: 4:4-11; 38:3-39:17.

32.     The importance of the video data segment may be calculated as a weighted average, as shown in the equation ($a_i$ is the attribute of the data and $w_i$ is the relative weight):

$$Y = \sum_{i=1}^{i=N} w_i a_i$$

'616 patent at 12:10-20.

33.     For example, in a case of six attributes to a particular video data segment, each weighted equally, the importance is calculated as "Y=(L+R+A+RS+TM+TS)/6." '616 patent at 12:28-32. Depending on the value of Y, the video data may be stored in the highest or other lower storage hierarchy. '616 patent at 12:22-27; 13:30-35. When a given hierarchical level becomes nearly full, the video segments of lowest importance are automatically cascaded to free space to accommodate new data. '616 patent at 12:65-13:17. A hierarchical storage manager

(HSM) 401 manages the storage of the video data segments and their corresponding locations. '616 patent at 13:36-39. The stored events may be later queried and retrieved from the appropriate hierarchy and migrated to a faster location for processing. '616 patent at 11:3-14.

34. The HSM system is complex and implements the following functions and sub-systems or a sub-set thereof, as described in detail in the patent: (a) storage hierarchy including on-site and off-site (network or cloud based) storage of various speeds and cost; (b) HSM Migration: data migration policy between different levels codified by preset mathematical rules or operator override; (c) HSM Archiving: archival of data to slower or remote storage based on importance or frequency of use; (d) HSM Rules Engine: automated control or change of data storage location based on predefined policy rules being triggered; and (e) HSM Audit Trails: storage of an audit record including information about each data access event to enhance data privacy. '616 patent at 13:36-16:51. In summary, the HSM provides a detailed formal design and framework of operation to handle the large amounts of data produced by security and surveillance systems.

## IV. The Asserted Patents are Inventive Concepts Under *Alice*

35. The Asserted Patents are in the same family of patents. SecureNet, the applicant, filed a patent application that issued as U.S. Patent No. 9,934,616 (the "'616 Patent") after June 2014 when the U.S. Supreme Court decided *Alice Corp. Party Ltd. v. CLS Bank, Int'l*, 573 U.S. 208, 216 (2014) ("*Alice*"). The '616 patent issued on May 17, 2016.

36.     In *Alice*, the Supreme Court outlined three narrow exceptions to patent eligibility ("laws of nature, natural phenomena and abstract ideas") and established a test for determining patent eligibility. *Id.* Under *Alice*, 'inventive concepts' sufficient to 'transform' the claimed abstract idea are eligible for patentability. *Id.* Whether a patent contains an 'inventive concept' entails consideration of the elements of each claim "both individually and as an ordered combination to determine whether they involve more than the performance of well-understood, routine, and conventional activities" to those skilled in the art at the relevant time. *Id.*

37.     During prosecution of the '616 patent in a November 4, 2015 interview, the applicant discussed with the Patent Examiner whether this patent would be eligible as an "inventive concept" under the test set forth in *Alice* and under 35 U.S.C. §101.

38.     The applicant also addressed *Alice* during the prosecution of each of U.S. Patent Nos. 10,862,744 and 11,323,314, confirming the patentability of the issued claims under 35 U.S.C. §101.

39.     The prosecution histories for the Asserted Patents are useful to show that certain limitations—either alone or in combination—constitute "inventive concepts" over the then-existing prior art. Specifically, in Step 2 of the *Alice* assessment of the Asserted Patents, the Applicant identified the following ideas as "inventive concepts," *either as alone or in combination*:

evaluating one more historical correlations by automatically analyzing said stored sensory events, ***across at least one of time and space,*** for one or more historical correlations stored among the sensory events; monitoring continuously and in-real time the primitive sensory events from one or more sensors based on the one or more historical correlations to identify one or more critical events . . . sending one or more alerts based on at least one of said critical events and said network failures events," which is an unconventional improvement of the state of the art at the time the applicant filed as evidence by the prior art cited in the IDS.

'984 Prosecution History (emphasis in original).

40.     During the prosecution of the applications that issued as the Asserted Patents, the applicant confirmed the patentability of the inventions under each of Sections 101, 102, 103, and 112 of Title 35.

41.     Attached hereto as **Exhibit 1** is the declaration of Richard C. Helfers, Ph. D. ("Helfers Dec.") Dr. Helfers is a professor of criminal justice with decades of experience in policing and security-related work.

42.      Dr. Helfers explains that the Asserted Patents are not directed at the kinds of duties that security guards perform. Rather, the patents are directed at problems that exist within the realm of computer problems that security guards have never been tasked with performing. Helfers Dec. at ¶8. He furthers that, the Asserted Patents account for disparate qualities of data obtained from different sensors, by weighting the "attribute data" of the sensors. *Id.* at ¶9. Security guards, on the other hand, do not typically interact with "attribute data of the sensors," or use attribute data to "weight" primitive events as required by the Asserted Patents. *Id.* These issues exist within the realm of computerized security systems. *Id.*

22

43. He further explains that, "[w]hile it is true that security guards utilize computerized security systems and information from security systems, they have not done so in the manner described and claimed in the patents." *Id.* at ¶9. "For example, security guards typically have no information on the attribute data of a given sensor. A security guard typically has no information on when a given sensor was last maintained, for example, which is one type of attribute data described in the patent specification." *Id.* "This type of attribute data is usually stored in databases accessible by IT personnel only, and is not the kind of data that security guards have access to, much less take into account during their day-to-day functions of monitoring security systems." *Id.* "Similarly, security guards typically have no access to other technical attribute data of sensors, such as a reliability of a bandwidth or power going to a given sensor, which again is a type of attribute data described and claimed in the patents, which only IT personnel typically have access to, not security guards." *Id.*

44. Dr. Helfers also clarifies that "security guards could not reasonably take into account attribute data such as sensor age, reliability, and power level for each sensor in a complex security system that contains hundreds, or even thousands of different sensors of different types in multiple locations (e.g., cameras, motion detectors, noise detectors, card swipes, door openings, smoke alarms, photobeam alarms, and much more), with different methods of communication and types of networking to the control center (e.g., radio frequency, microwave, optical cable)." *Id.* at ¶9.

45.     He states further that, the Asserted Patents are directed at solving "correlating data obtained from different types of sensors located in different geographical locations." *Id.* at ¶10. "Although security guards certainly do observe video monitors that display scenes from video cameras in different locations, they do not perform the type of 'correlation' at which the patents are directed." *Id.* "Rather, the correlation described in the patents can only be performed by computers capable of processing digital data, such as the 'attribute data' of sensors that is used in correlating the events." *Id.* "For example, certain claims of the Asserted Patents discuss generating new rules based on the correlated primitive events and the actions taken, so that future events can be more accurately correlated, with the appropriate actions being undertaken automatically." *Id.*

46.     Dr. Helfers concludes that the type of correlation disclosed by the patents exists solely within the realm of computerized security systems whereas security guards simply observe their surroundings and video monitors in order to respond to threats; they do not "correlate" events "weighted by attribute data," and do not "generate" new "rules" that are followed automatically. *Id.*

47.     Dr. Helfers illustrates that, for example, "security guards are stationed at different physical locations on a sprawling university or corporate campus, change shifts, and are laid off or fired. There is no proper sense in which any security guard can—or in practice does—correlate data across disparate geographical locations or points in time—as claimed in the patents." *Id.* at ¶11. He explains, that his "understanding of the invention is that it provides a novel way of

24

correlating across space and time what has heretofore not been possible nor performed by any security guards." *Id.*

48.     Dr. Helfers further explains that, "[y]et another problem that the patents are directed at solving is comparing data originating from different types of sensors and security systems, which may use disparate protocols, each with its own proprietary data format. The Asserted Patents address this problem by 'normalizing' this data so that it can be effectively compared. Security guards do not perform this function. Security guards are generally not familiar with, much less involved in, accounting for discrepancies among various digital protocols and data formats used by sensors and security systems, which is what the 'normalization' limitation of the Asserted Patents address." *Id.* at ¶12.

49.     For example, "security guards are used to using a disparate array of 'siloed' computerized security systems that do not 'talk' to each other. This leaves the security guards with a disorganized array of incompatible and confusing data. The disparate computerized security systems historically available to security guards may often cause more confusion, and obfuscate the real threat, rather than illuminate it. In contrast, the claimed invention utilizes a computerized correlation engine that takes data from multiple sources that have been normalized by a normalization engine, which transforms the data from various unrelated security systems into a coherent picture for the security guards to then take action on. This is not something that was available to security guards previously." *Id.* at ¶12. Dr. Helfers summarizes that an "individual could not perform the patents' functions

25

mentally or with pen and paper. The patents describe problems and solutions existing within the realm of computerized security systems; it would not be possible to reduce the patents' claimed functionality to paper or to mental processes. It is not part of the job of a security guard, much less routine, to perform the kinds of complex and computerized correlations of normalized sensory data as described and claimed in these patents." *Id.* at ¶13.

## V.    Siemens Product Offerings

50.    Siemens offers software linking data from various sensors, storage, analytics, and services to enable its customers to deploy systems and methods that practice SecureNet's claimed inventions.

51.    Siemens sells its Siveillance Suite which can use its Siveillance Control or Siveillance Control Pro as the Physical Security Information Management system in conjunction with video surveillance management software such as Siveillance Video Advanced and Siveillance Video Pro.

52.    The Accused Product incorporates SecureNet's inventions.

### A.    Background of the Siveillance Suite

53.    Through its Siveillance Suite, Siemens offers a comprehensive range of security solutions and systems, which includes intelligent video surveillance, access control and identity management as well as perimeter protection, up to industrial command and control center technology, all of which can be configured according to customer, site or industry requirements.[2]

---

[2] https://www.siemens.com/global/en/products/buildings/security/security-management.html

54. The Siveillance Suite includes Siveillance Control and Siveillance Control Pro, both of which are Physical Security Information Management Systems that, according to Siemens, use the latest technology and methods to import sensors and integrate data. Siveillance Control Brochure at 1; Siveillance Control Pro Brochure at 5.

55. Siveillance Control Pro is specifically designed for use in critical infrastructure like airports, ports, mass transportation, energy as well as industrial complexes, heavy industries, hospitals, or school campuses. Siveillance Control Pro combines multiple safety and security subsystems with command and control features into one user interface in an effort to enhance situational awareness, streamline operations and quicker response coordination. Siveillance Control Pro Brochure at 5.

56. Siemens provides a chart showing Siveillance Pro's functionality.



Siveillance Control Pro Brochure at 4.

57.    Siveillance Control Pro has a graphical user interface that provides an intuitive, hierarchical structure for status information, events, resources, and actions. Siemens touts Siveillance Control Pro as being designed to handle hundreds of thousands of devices and thousands of events per day. Siveillance Control Pro Brochure at 4.

58.    Siveillance Control boasts a logical structure and user interface for optimized decision-making and incident management, increasing safety and security for employees and visitors, assuring operational continuity, and ensuring compliance to corporate security policies. Siveillance Control Brochure at 1.

59.    Siveillance Control has an open, flexible architecture that consolidates a variety of safety and security systems, such as access control, intrusion detection, and video surveillance, all on one common platform. Further, its open interface allows for the integration of future generations of hardware and software. Siveillance Control Brochure at 1.

60.    Siemens offers Siveillance Control to enhance customer's decision support processes with what it claims is the most advanced event handling capabilities on the market. Siveillance Control permits incident management through intelligent workflows of subsystem data that allows for grouping of related alarms and messages into one event. The user interface is structured to be clear and allow efficient handling of situations and minimization of mistakes. The

28

information displayed is tailored to the situation, to help improve decision making. Siveillance Control Brochure at 2.

61. Siveillance Control's multi-view feature provides operators with a quick, visual assessment of events for a rapid, informed response, which includes a varied visual representation of graphic, video, and web, colored highlighting of areas affected, and simultaneous event-related representation of graphic elements. Siveillance Control Brochure at 2.

62. Siveillance Control incorporates fully geo-referenced systems intelligence so that the entire structure can be mapped across buildings, events, and disciplines using a fusion of data models and infrastructure specifications. Siemens touts Siveillance Control as providing a holistic understanding of the situation for faster processing and a better quality of data, resulting in the highest situational awareness. Siveillance Control Brochure at 2.

63. Siemens lauds Siveillance Control for its ability to minimize errors, time and cost by correlating maps and floor plans with subsystem expert data, automatically assigning detectors and objects to freely defined areas (e.g., rooms, floors), and automatically correlating events based on geo-referencing. Siveillance Control Brochure at 2.

64. Along with Siveillance Control and Control Pro, Siemens' Siveillance Suite includes Siveillance Video Advanced and Pro (collectively Siemens' "Siveillance VMS"), both of which are video surveillance management software (VMS) that have intuitive and rule-based defined workflows and intuitive graphic

user interfaces that permit quick handling of alarms and video process scenarios. Siveillance Video Comparison Guide at 3.

65. The Siveillance VMS is designed for centrally managed multi-server deployments with support of multiple devices. It offers centralized management of all devices, servers and users, and empowers an extremely flexible rule engine driven by schedules and events. Siveillance Video Advanced Data and Specification Sheet at 4.

66. The Siveillance VMS can support an unlimited number of cameras. The cameras can be accessed from a computer associated with a server, or multiple servers, on which the Siveillance VMS is installed. Siveillance Video System Architecture Document at 7; Siveillance Video Advanced Data and Specification Sheet at 7-8, 13; Siveillance Video Comparison Guide at 4.

67.     The below diagram shows an overview of the Siveillance VMS

architecture options:



The communication between servers, devices and clients (i.e., interfaces) is over an

IP network. Siveillance Video System Architecture Document at 7, 40-46, 51-53.

68.     The Siveillance VMS has the ability to handle numerous events,

including hardware configurable events, motion detection events, manual/user

defined events, and generic events. Siveillance Video Comparison Guide at 9;

Siveillance VMS Architecture & Engineering Specs at 16; Siveillance Video

Advanced Data & Specification Sheet at 19.

69.     Siveillance VMS is designed to run remotely from an operator's

computer for day-to-day use in order to manage IP surveillance cameras, and it

provides instant control of cameras and connected security devices and quick access

to live and recorded video and metadata. Siveillance Video System Architecture at

11.

70. Siveillance VMS has the capability of providing License Plate Recognition (LPR) using video-based content analysis. The LPR uses optical character recognition on images aided by specialized camera settings. Siveillance Video System Architecture at 18, 44; Siveillance Video Advanced Data & Specification Sheet at 4.

71. Siveillance VMS provides central management of all internal systems alarms and external security alarms. The alarms can be configured how the user would like, including tying them to events or sources, setting priority levels, as well as allowing varying pieces of information to be tied to alarms. Siveillance VMS Architecture and Engineering Specs at 16-19; Siveillance Video Comparison Guide at 11; Siveillance Video Advanced Data & Specification Sheet at 21.

72. Siveillance VMS provides secure multi-stage storage, which combines superior performance and scalability with video data grooming for cost efficient, long-term video storage. Siveillance VMS uses storage containers, which are defined as live database and one optional archive, where the video data is moved from the live database to secondary disk systems or network drives. The archived data remains online and available for clients. Siveillance Video Advanced Data & Specification Sheet at 8, 13-14; Siveillance Video Comparison Guide at 11-12; Siveillance VMS Architecture & Engineering Specs at 25-26.

**B.  Receiving, capturing, processing sensory data.**

73. Claim 1 of the '837 patent's preamble and first element include the following: 1. An alerting system, comprising: one or more sensors for capturing

32

sensory data . . . one or more processors, connected to the one or more sensors via the network.

74. Claim 13 of the '098 patent's preamble and first element include the following: 13. A safety method, comprising the steps of: capturing sensory data from one or more sensors.

75. Claim 34 of the '926 patent's preamble and first element include the following: 34. A safety method, comprising the steps of: capturing sensory data from one or more sensors.

76. Claim 48 of the '616 patent's preamble and first element include the following: 39. A non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causing the hardware processor to execute steps comprising: receiving sensory data about a physical environment from one or more sensors.

77. Claim 22 of the '984 patent's preamble and first element include the following: 1. A monitoring system comprising a non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causing the hardware processor to execute steps comprising: receiving sensory data about a physical environment from one or more sensors.

78. Claim 13 of the '314 patent's preamble and first element include the following: "1. A non-transitory, physical storage medium storing computer-readable

program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement: receive one or more sensory events from a sensory event analytics module that receives sensory data about a physical environment from one or more sensors and processes the sensory data from the one or more sensors to detect the one or more sensory events, wherein the one or more sensors comprises at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events are selected from the group consisting of a face detected, a vehicle detected, a license plate detected, a size of an object, and a speed of an object.

79. Claim 6 of the '870 patent's preamble and first element include the following: 1. A non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement: a receiver module to receive one or more sensory events from a sensory event analytics module that receives sensory data about a physical environment from one or more sensors and processes the sensory data from the one or more sensors to detect the one or more sensory events, wherein the one or more sensors comprises at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events are selected from the group consisting of a face detected, a vehicle detected, and a license plate detected.

80. The accused Siveillance Suite is a software video management platform deployed on physical servers. The Siveillance Suite is designed for

34

centrally managed multi-server deployments with support of multiple devices, and it offers centralized management of all devices, servers and users, and empowers an extremely flexible rule engine driven by schedules and events. *See* Siveillance Video Advanced Data and Specification Sheet at 4; Siveillance Control Pro Brochure at 5; Siveillance Control Brochure at 1.

81.    Siemens provides a visual example of how its Siveillance Suite receives, captures, and processes sensory data:



The recording stream from an IP video camera is retrieved by the recording server. Then stream is recorded in the recording server database based on rules. The recorded stream is retrieved by Siveillance Video Client on playback request. Siveillance Video System Architecture Document at 11, 29.

82.    The recording server is responsible for all communication, recording, and event handling related to devices such as cameras, Video and audio encoders,

I/O modules, and metadata sources. Examples of actions the recording server handles:

- Retrieve Video, audio, metadata and I/O event streams from the devices.

- Record Video, audio and metadata from devices.

- Provide operators with access to live and recorded Video, audio and metadata.

- Provide operators with access to device status.

- Trigger system and Video events on device failures or events.

- Perform motion detection and generate smart search metadata.

Siveillance Video System Architecture Document at 8.

83.     In describing features supported by its video management software, Siemens lists "metadata from camera embedded analytics" and "motion metadata generated during [Video Motion Detection or] VMD analysis. Siveillance Video Comparison Guide at 7-8.

84.     Siemens also lists as a feature of its video management software the use of License Plate Recognition or LPR for vehicle analytics. Specifically, LPR offers Video-based content analysis (VCA) and recognition of vehicle license plates. To read the characters on a plate, LPR uses optical character recognition on images aided by specialized camera settings. Siveillance Video Advanced Data & Specification Sheet at 4; Siveillance Video System Architecture Documents at 18.

36

85.    Siemens provides an example of how its video management software would work with LPR video-based analysis:



Siemens explains that live streams from cameras configured for LPR retrieved by the recording server. Then, streams from the recording server are retrieved by the LPR server. The LPR server recognizes license plates by comparing them with internal lists. Finally, if there is a match, the event server sends events and alarms to the Sivellance Video Client. Sieveillance Video System Architecture Documents at 44.

## C.    Storing Sensor Data

86.    Claim 1 of the '837 patent recites "a hierarchy of two or more data storage devices, connected to the one or more sensors via network, for storing the sensory data from the one or more sensors."

87.     Claim 13 of the '098 patent recites "storing the sensory data from the one or more sensors in a data storage device."

88.     Claim 34 of the '926 patent recites "storing the sensory data from the one or more sensors in a data storage device."

89.     Claim 48 of the '616 patent recites "storing the normalized sensory events in an event database for later retrieval."

90.     Claim 22 of the '984 patent recites "storing the normalized sensory events in an event database for later retrieval."

91.     Claim 13 of the '314 patent recites "a hierarchical storage manager having access to a hierarchy of two or more data storage devices, wherein the two or more data storage devices are adapted to store data from the one or more sensors, wherein the hierarchical storage manager is adapted to manage storage and cascade of data through the hierarchy of two or more data storage devices based at least on the sensory events; an event queue having access to an event database to store the sensory events for later retrieval as stored sensory events;"

92.     Claim 6 of the '870 patent recites "an event queue having access to an event database to store the sensory events for later retrieval as stored sensory events;"

93.     The accused Siveillance Suite is described as having a multi-stage, hierarchical storage systems implemented by the recording server and media database. Siveillance Video Comparison Guide at 12 ("[m]ulti-stage video storage and data grooming."); Siveillance Video System Architecture at 8-9 ("The media

38

database supports various unique features including multistage archiving, video grooming, encryption and adding a digital signature to the recordings.").

94.    Siemens further describes its Siveillance VMS as providing secure multi-stage storage, which combines superior performance and scalability with video data grooming for cost efficient, long-term video storage, and as using storage containers, which are defined as live database and one optional archive, where the video data is moved from the live database to secondary disk systems or network drives. The archived data remains online and available for clients. Siveillance Video Advanced Data & Specification Sheet at 8, 13-14; Siveillance Video Comparison Guide at 11-12; Siveillance VMS Architecture & Engineering Specs at 25-26.

**D.    Correlation of sensor data to identify critical events**

95.    Claim 1 of the '837 patent recites "correlate two or more primitive events, the primitive events weighted by the attribute data of the sensors used to capture the sensory data."

96.    Claim 13 of the '098 patent recites "correlating two or more primitive events to determine one or more correlated events using the computer processor;"

97.    Claim 34 of the '926 patent recites "correlating two or more primitive events, weighted by attribute data representing information about the sensors used to sense the primitive events, to determine one or more correlated events using the computer processor."

98.    Claim 48 of the '616 patent recites "evaluating one or more historical correlations by automatically analyzing said primitive sensory events, across at

least one of time and space, for one or more historical correlations among the historical normalized sensory events; monitoring continuously and in real-time the primitive sensory events from the one or more sensors based on the one or more historical correlations to identify one or more critical events;"

99.     Claim 22 of '984 patent recites "evaluating one or more historical correlations by automatically analyzing said stored sensory events, across at least one of time and space, for one or more historical correlations among the stored sensory events; monitoring continuously and in real-time the primitive sensory events from the one or more sensors based on the one or more historical correlations to identify one or more critical events; monitoring continuously and in real-time the network status of one or more of the sensors based on the IP data to identify one or more network failure events . . . 21. The system of claim 1, wherein the one or more primitive sensory events is at least a face detected. 22. The system of claim 21, wherein the face detected is correlated with other primitive events based on attribute data of a given sensor that detected the face;"

100.    Claim 13 of the '314 patent recites "a correlation module to evaluate one or more historical correlations among the stored sensory events, wherein the correlation module evaluates the stored sensory events for the one or more historical correlations across at least one of time and space, wherein the correlation module is adapted to monitor the received sensory events to identify one or more critical events, and wherein the one or more critical events are based at least on the one or more historical correlations;"

40

101.    Claim 6 of the '870 patent recites "a correlation module to evaluate one or more historical correlations among the stored sensory events, wherein the correlation module evaluates the stored sensory events for the one or more historical correlations across at least one of time and space based on at least weighting of the stored sensory events, and wherein the stored sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data."

102.    Siemens touts its Siveillance Physical Security Information Management Systems as combining multiple safety and security subsystems with command and control features into one user interface in an effort to enhance situational awareness, streamline operations and quicker response coordination. Siveillance Control Pro Brochure at 5; Siveillance Control Brochure at 1 ("Siveillance Control has an open, flexible architecture that consolidates a variety of safety and security systems, such as access control, intrusion detection, and video surveillance, all on one common platform.").

103.    Siemens offers Siveillance Suite to enhance customer's decision support processes with what it claims is the most advanced event handling capabilities on the market, which permits incident management through intelligent workflows of subsystem data that allows for grouping of related alarms and messages into one event. Through its Siveillance Suite, Siemens offers its customers the ability to minimize errors, time and cost by correlating maps and floor plans with subsystem expert data, automatically assigning detectors and objects to freely

41

defined areas (e.g., rooms, floors), and automatically correlating events based on geo-referencing. Siveillance Control Brochure at 2.

104.    Siemens Siveillance Suite is offered as managing detectors and alarms to ensure that the most critical incidents are treated first, no matter the customer's structure or hierarchies for prioritizing specific signals or events. Siveillance Control Pro Brochure at 3.

105.    Siemens Siveillance Suite uses open interfaces and can integrate and interact with various subsystems from access control, video surveillance, fire alarm systems, emergency call systems, telephone, radio communications, mass notification to biometric related devices and vehicle or license recognition software. Siveillance Control Pro Brochure at 5; Siveillance Control Brochure at 1 ("Open interfaces ensure that future generations of hardware and software used can integrate easily, thus offering maximum in flexibility and investment protection."); Siveillance Video System Architecture Document at 9 ("The event server offers third-party access for sending events to the system via the Generic events or Analytics events interface."); Siveillance Video Comparison Guide at 4 (noting third-party application integration and support for video analytics).

106.    Siemens provides a diagram of how its Siveillance Suite can coordinate sensor data to identify critical events:



The diagram shows data from alarms, access control or maps, third-party integrations, access control integrations, analytics events, generic events and recording server all travel to the event server to be coordinated and sent back to the client to identify critical events. Siveillance Video System Architecture Document at 42.

**E.    Use of weighting to reduce false positives**

107.    Claim 1 of the '837 patent recites "correlate two or more primitive events, the primitive events weighted by the attribute data of the sensors used to capture the sensory data."

108.    Claim 13 of the '098 patent recites "processing the sensory data from the sensors, weighted by attribute data representing information about the sensors

used to capture the sensory data, to detect primitive events in the sensory data using a computer processor;"

109.     Claim 34 of the '926 patent recites "correlating two or more primitive events, weighted by attribute data representing information about the sensors used to sense the primitive events, to determine one or more correlated events using the computer processor;"

110.     Claim 48 of the '616 patent recites "48. The non-transitory, physical storage medium of claim 39, wherein the primitive sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data;"

111.     Claim 22 of the '984 patent recites "21. The system of claim 1, wherein the one or more primitive sensory events is at least a face detected. 22. The system of claim 21, wherein the face detected is correlated with other primitive events based on attribute data of a given sensor that detected the face;"

112.     Claim 13 of the '314 patent recites "13. The non-transitory, physical storage medium of claim 1, wherein the sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data;"

113.     Claim 6 of the '870 patent recites "wherein the stored sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data."

114.    Siemens Siveillance Suite is built to combine various safety and security subsystems, allow user defined prioritization of events or alarms, and analyzation of the information to assist users in making fast and effective decisions while minimizing errors. Siveillance Control Pro Brochure at 5; Siveillance Control Brochure at 2.

115.    Siemens Siveillance Suite uses sensor-attribute-dependent parameters and metadata in generating and handling events. Siveillance Video Comparison Guide at 4, 8 (referencing "Built-in Video Motion Detection (VMD) with Auto adjustable VMD sensitivity" with "Auto adjustable VMD sensitivity," "Motion metadata generated during VMD analysis," and "VMD exclusion zones").

116.    The Siveillance Suite allows for detection adjustments based on characteristics of the video stream, including resolution, motion, noise, scene content, etc.). For example, its device configuration options allow "fine-tune motion detection sensitivity per camera manually or automatically," the application of exclusion zones where motion detection is disabled to avoid unwanted detection. Siemens' literature also states that its system supports device events that "relate to certain functions and states of devices available." Siveillance Video Advanced Data & Specification Sheet at 14, 21.

117.    The Siveillance Suite allows for 32,000 alarm priority levels. These priority levels are customizable by priorities, categories and statuses, which permit organization that allows focus on most critical alarms. Siveillance Video Advance Data & Specification Sheet at 17, 21; Siveillance Video Comparison Guide at 11.

45

## VI.    The Asserted Claims

## Count 1

## Infringement of U.S. Patent No. 7,737,837

118.    Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

119.    SecureNet is the owner by assignment of United States Patent No. 8,130,098, entitled "Hierarchical Data Storage Manager, Anonymous Tip Processing Engine, and a Vehicle Information Processing Engine for Security and Safety Applications." The '837 patent was duly and legally issued by the United States Patent & Trademark Office on June 15, 2010. A true and correct copy of the '837 patent is attached as **Exhibit 2**.

120.    Defendant has offered for sale, sold and/or imported in the United States accused products that directly or indirectly infringes the '837 patent since the issuance of the '837 patent.

121.    Defendant has directly and indirectly infringed and continues to infringe the '837 patent, for example, by making, selling, offering for sale, and/or importing, and through its own use and testing of the accused products in the United States and here in Illinois. In addition, on information and belief, Defendant uses the accused products while providing technical support and repair services to Defendant's customers.

122.    Non-limiting examples of the Siemens' infringement of claim 1 of the '098 patent is via its Siveillance Suite infringes claim 1:

46

13. An alerting system, comprising:

one or more sensors for capturing sensory data;

a hierarchy of two or more data storage devices, connected to the one or more sensors via network, for storing the sensory data from the one or more sensors;

one or more processors, connected to the one or more sensors via the network; and

one or more memories, operatively coupled to the one or more processors, the one or more memories comprising program code to:

> capture sensory data from the one or more sensors;
> capture attribute data representing information about the sensors used capture the sensory data;
> process the sensory data from the one or more sensors to detect primitive events in the sensory data;
> correlate two or more primitive events, the primitive events weighted by the attribute data of the sensors used to capture the sensory data; and
> perform one or more actions based on the correlation performed in the correlating step.

123.     Siemens Siveillance Suite practices the elements of claim 1 of the '837 patent (¶¶53-72, 79-84, 91-92, 99-103, 110-113).

## Count 2

## Infringement of U.S. Patent No. 8,130,098

124.     Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

125.     SecureNet is the owner by assignment of United States Patent No. 8,130,098, entitled "Systems and methods for safety and business productivity." The '098 patent was duly and legally issued by the United States Patent & Trademark

Office on March 6, 2012. A true and correct copy of the '098 patent is attached as **Exhibit 3**.

126.    Defendant has offered for sale, sold and/or imported in the United States accused products that directly or indirectly infringes the '098 patent since the issuance of the '098 patent.

127.    Defendant has directly and indirectly infringed and continues to infringe the '098 patent, for example, by making, selling, offering for sale, and/or importing, and through its own use and testing of the accused products in the United States and here in Illinois. In addition, on information and belief, Defendant uses the accused products while providing technical support and repair services to Defendant's customers.

128.    Non-limiting examples of the Siemens' infringement of claim 13 of the '098 patent is via its Siveillance Suite infringes claim 13:

> 13. A safety method, comprising the steps of:
>
> capturing sensory data from one or more sensors;
>
> storing the sensory data from the one or more sensors in a data storage device;
>
> processing the sensory data from the sensors, weighted by attribute data representing information about the sensors used to capture the sensory data, to detect primitive events in the sensory data using a computer processor;
>
> correlating two or more primitive events to determine one or more correlated events using the computer processor; and
>
> performing one or more actions to ensure safety procedures are followed based on the correlation performed in the correlating step.

129.     Siemens Siveillance Suite enables a customer to practice the method of claim 13 of the '098 patent (¶¶53-72, 79-84, 91-92, 99-103, 110-113).

## Count 3

### Infringement of U.S. Patent No. 8,354,926

130.     Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

131.     SecureNet is the owner by assignment of United States Patent No. 8,354,926, entitled "Systems and methods for business process monitoring." The '926 patent was duly and legally issued by the USPTO on January 15, 2013. A true and correct copy of the '926 patent is attached as **Exhibit 4**.

132.     Defendant has offered for sale, sold and/or imported in the United States accused products that directly or indirectly infringes the '926 patent since the issuance of the '926 patent. Defendant has directly and indirectly infringed and continues to infringe the '926 patent, for example, by making, selling, offering for sale, and/or importing accused products, and through its own use and testing of them in the United States and here in Illinois. In addition, on information and belief, Defendant uses them while providing technical support and repair to Defendant's customers.

133.     Non-limiting examples of Siemens' infringement of claim 34 of the '926 patent is via its Siveillance Suite as outlined below:

34. A method to ensure business process are followed, comprising the steps of:

49

capturing sensory data from one or more sensors;

storing the sensory data from the one or more sensors in a data storage device;

processing the sensory data from the sensors, weighted by attribute data representing information about the sensors used to capture the sensory data, to detect primitive events in the sensory data using a computer processor;

correlating two or more primitive events to determine one or more correlated events using the computer processor; and

performing one or more actions to ensure safety procedures are followed based on the correlation performed in the correlating step.

134.    Siemens Siveillance Suite enables a customer to practice the method of claim 34 of the '926 patent (¶¶53-72, 79-84, 91-92, 99-103, 110-113).

## Count 4

## Infringement of U.S. Patent No. 9,344,616

135.    Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

136.    SecureNet is the owner by assignment of United States Patent No. 9,344,616, entitled "Correlation engine for security, safety, and business productivity." The '616 patent was duly and legally issued by the USPTO on May 17, 2016. A true and correct copy of the '616 patent is attached as **Exhibit 5**.

137.    Defendant has offered for sale, sold and/or imported in the United States accused products that directly or indirectly infringes the '616 patent since the issuance of the '616 patent. Defendant has directly and indirectly infringed and continues to infringe the '616 patent, for example, by making, selling, offering for sale, and/or importing accused products, and through its own use and testing of

them in the United States and here in Illinois. In addition, on information and belief, Defendant uses them while providing technical support and repair to Defendant's customers.

138.    Non-limiting examples of Siemens' infringement of claim 48 of the '616 patent is via its Siveillance Suite as outlined below:

> 39. A non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causing the hardware processor to execute steps comprising:
>
> [A] receiving sensory data about a physical environment from one or more sensors;
>
> [B] receiving IP data of the one or more sensors, wherein the IP data comprises at least an Internet Protocol (IP) address and a network status of at least one of the sensors;
>
> [C] processing the sensory data from the one or more sensors to detect one or more primitive sensory events;
>
> [D] normalizing the primitive sensory events into a standardized data format;
>
> [E] storing the normalized sensory events in an event database for later retrieval;
>
> [F] retrieving one or more historical normalized sensory events from the event database;
>
> [G] evaluating one or more historical correlations by automatically analyzing said primitive sensory events, across at least one of time and space, for one or more historical correlations among the historical normalized sensory events;
>
> [H] monitoring continuously and in real-time the primitive sensory events from the one or more sensors based on the one or more historical correlations to identify one or more critical events;

[I] monitoring continuously and in real-time the network status of one or more of the sensors based on the IP data to identify one or more network failure events; and

[J] sending one or more alerts based on at least one of said critical events and said network failure events.

[K] 48. The non-transitory, physical storage medium of claim 39, wherein the primitive sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data.

139. Siemens Siveillance Suite practices elements A, B, C, F, G, H, I, J, K of claim 48 of the '616 (¶¶53-72, 79-84, 91-92, 99-103, 110-113). On information on belief, the Siveillance Suite normalizes data from various sensors and inputs.

## Count 5

## Infringement of U.S. Patent No. 9,619,984

140. Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

141. SecureNet is the owner by assignment of United States Patent No. 9,619,984, entitled "Systems and methods for correlating data from IP sensor networks for security, safety, and business productivity applications." The '984 patent was duly and legally issued by the USPTO on April 11, 2017. A true and correct copy of the '984 patent is attached as **Exhibit 6**.

142. Defendant has offered for sale, sold and/or imported in the United States accused products that directly or indirectly infringes the '984 patent since its issuance. Defendant has directly and indirectly infringed and continues to infringe the '984 patent, for example, by making, selling, offering for sale, and/or importing accused products, and through its own use and testing of them in the United States

and here in Illinois. In addition, on information and belief, Defendant uses them while providing technical support and repair to Defendant's customers.

143.   Non-limiting examples of Siemens' infringement of claim 22 of the '984 patent is via its Siveillance Suite as outlined below:

> 1. A monitoring system comprising a non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causing the hardware processor to execute steps comprising:
>
> [A] receiving sensory data about a physical environment from one or more sensors;
>
> [B] receiving IP data of the one or more sensors, wherein the IP data comprises at least an Internet Protocol (IP) address and a network status of at least one of the sensors;
>
> [C] processing the sensory data from the one or more sensors to detect one or more primitive sensory events;
>
> [D] normalizing the primitive sensory events into a standardized data format;
>
> [E] storing the normalized sensory events in an event database for later retrieval;
>
> [F] retrieving one or more stored sensory events from the event database;
>
> [G] evaluating one or more historical correlations by automatically analyzing said stored sensory events, across at least one of time and space, for one or more historical correlations among the stored sensory events;
>
> [H] monitoring continuously and in real-time the primitive sensory events from the one or more sensors based on the one or more historical correlations to identify one or more critical events;
>
> [I] monitoring continuously and in real-time the network status of one or more of the sensors based on the IP data to identify one or more network failure events; and

[J] sending one or more alerts based on at least one of said critical events and said network failure events.

[K] 21. The system of claim 1, wherein the one or more primitive sensory events is at least a face detected.

[L] 22. The system of claim 21, wherein the face detected is correlated with other primitive events based on attribute data of a given sensor that detected the face.

144.    Siemens Siveillance Suite practices elements A, B, C, F, G, H, I, J, K of claim 22 of the '984 patent (¶¶53-72, 79-84, 91-92, 99-103, 110-113).

145.    On information on belief, the Siveillance Suite normalizes data from various sensors and inputs and stores the normalized data. On information and belief, Siveillance Suite can correlate a face detected with other primitive events based on attribute data of the sensor when integrated with a third-party application using such video analytics. *See supra* ¶¶102-103.

## Count 6

## Infringement of U.S. Patent No. 11,323,314

146.    Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

147.    SecureNet is the owner by assignment of United States Patent No. 11,323,314, entitled "Heirarchical data storage and correlation system for correlating and storing sensory events in a security and safety system." The '314 patent was duly and legally issued by the USPTO on May 3, 2020. A true and correct copy of the '314 patent is attached as **Exhibit 7**.

148.    Defendant has offered for sale, sold and/or imported in the United States accused products that directly or indirectly infringes the '314 patent since its

issuance. Defendant has directly and indirectly infringed and continues to infringe the '314 patent, for example, by making, selling, offering for sale, and/or importing accused products, and through its own use and testing of them in the United States and here in Illinois. In addition, on information and belief, Defendant uses them while providing technical support and repair to Defendant's customers.

149.    Non-limiting examples of Siemens' infringement of claim 13 of the '314 patent is via its Siveillance Suite as outlined below:

> 1. A non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement:
>
> receive one or more sensory events from a sensory event analytics module that receives sensory data about a physical environment from one or more sensors and processes the sensory data from the one or more sensors to detect the one or more sensory events, wherein the one or more sensors comprises at least an Internet Protocol (IP) video camera, and wherein the one or more sensory events are selected from the group consisting of a face detected, a vehicle detected, a license plate detected, a size of an object, and a speed of an object;
>
> a hierarchical storage manager having access to a hierarchy of two or more data storage devices, wherein the two or more data storage devices are adapted to store data from the one or more sensors, wherein the hierarchical storage manager is adapted to manage storage and cascade of data through the hierarchy of two or more data storage devices based at least on the sensory events;
>
> an event queue having access to an event database to store the sensory events for later retrieval as stored sensory events;
>
> a correlation module to evaluate one or more historical correlations among the stored sensory events, wherein the correlation module evaluates the stored sensory events for the one or more historical correlations across at least one of time and space, wherein the correlation module is adapted to monitor the received sensory events

to identify one or more critical events, and wherein the one or more critical events are based at least on the one or more historical correlations; and

an alerting module to send one or more alerts based on the one or more critical events,

wherein communication between the sensory event analytics module, the hierarchical storage manager, the correlation module, and the alerting module occurs over an IP network..

13. The non-transitory, physical storage medium of claim 1, wherein the sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data.

150.    The Siveillance Suite practices claim 13 of the '314 patent (¶¶53-72, 79-84, 91-92, 99-103, 110-113).

## Count 7

## Infringement of U.S. Patent No. 11,929,870

151.    Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

152.    SecureNet is the owner by assignment of United States Patent No. 11,929,870, entitled "Correlation engine for correlating sensory events." The '870 patent was duly and legally issued by the USPTO on March 12, 2024. A true and correct copy of the '870 patent is attached as **Exhibit 8**.

153.    Defendant has offered for sale, sold and/or imported in the United States accused products that directly or indirectly infringes the '870 patent since its issuance. Defendant has directly and indirectly infringed and continues to infringe the '870 patent, for example, by making, selling, offering for sale, and/or importing accused products, and through its own use and testing of them in the United States

and here in Illinois. In addition, on information and belief, Defendant uses them while providing technical support and repair to Defendant's customers.

154.    Non-limiting examples of Siemens' infringement of claim 6 of the '870 patent is via its Siveillance Suite as outlined below:

> 1. A non-transitory, physical storage medium storing computer-readable program code, the program code executable by a hardware processor, the program code when executed by the hardware processor causes the hardware processor to implement:
>
> [A] a receiver module to receive one or more sensory events from a sensory event analytics module that receives sensory data about a physical environment from one or more sensors and processes the sensory data from the one or more sensors to detect the one or more sensory events, wherein the one or more sensors comprises at least
>
> [B] an Internet Protocol (IP) video camera, and wherein the one or more sensory events are selected from the group consisting of a face detected, a vehicle detected, and a license plate detected;
>
> [C] an event queue having access to an event database to store the sensory events for later retrieval as stored sensory events; and
>
> [D] a correlation module to evaluate one or more historical correlations among the stored sensory events, wherein the correlation module evaluates the stored sensory events for the one or more historical correlations across at least one of time and space based on at least weighting of the stored sensory events, and wherein the stored sensory events are weighted based at least on one or more attribute data of the one or more sensors used to capture the sensory data.
>
> 2. The non-transitory, physical storage medium of claim 1, further comprising program code to implement:
>
> [E] an alerting module to send one or more alerts based on one or more critical events, wherein communication between the sensory event analytics module, the correlation module, and the alerting module occurs over an IP network; and
>
> [F] a network analytics module to receive IP data of the one or more sensors, wherein the IP data comprises at least an IP address and a

network status of at least one of the sensors, and wherein the network analytics module is adapted to process the IP data of the one or more sensors to detect one or more network events.

3. The non-transitory, physical storage medium of claim 2, further comprising program code to implement:

[G] a normalization module to normalize the sensory events and the network events into a standardized data format to generate normalized sensory events and normalized network events.

4. The non-transitory, physical storage medium of claim 3, further comprising program code to implement:

[H] an event queue to queue the normalized sensory events and the normalized network events for storage in the event database.

[I] 5. The non-transitory, physical storage medium of claim 4, wherein the correlation module is adapted to evaluate one or more historical correlations by automatically analyzing the stored sensory events and the stored network events, across at least one of time and space, for one or more historical correlations among the stored sensory events and the stored network events.

[J] 6. The non-transitory, physical storage medium of claim 5, wherein the correlation module is adapted to monitor continuously and in real-time the normalized sensory events and the normalized network events to identify the one or more critical events, and wherein the one or more critical events are based at least on the one or more historical correlations among the stored sensory events and the stored network events.

155.    The Siveillance Suite practices elements A-F, and I of claim 6 of the '870 patent (¶¶53-72, 79-84, 91-92, 99-103, 110-113).

156.    On information on belief, the Siveillance Suite normalizes data from various sensors and inputs, stores the normalized data, and correlates based on normalized data.

**Count 8**

**Willful Infringement of the Asserted Patents**

157.    Plaintiff realleges and incorporates by reference the foregoing paragraphs, as if fully set forth herein.

158.    In late March 2010, SecureNet gave actual notice of U.S. Patents 7,382,244 and 7,595,815 as well as Patent Application No. 12/106,951 to Siemens. Patent Application No. 12/106,951 became U.S. Patent 7,737,837 in June 2010, and the '244, '815, and '837 patents are all in the same patent family as the '098 patent and the 6 '92patent.

159.    Upon information and belief, Siemens has long been a key player in the security industry and sometime in 2014, Siemens began working with Milestone Systems, Inc. to develop video management software for use in providing security services. In 2015, Siemens announced its long-term strategic partnership with Milestone and that Milestone's technology was used in Siemens' Siveillance video management software. Milestone had received actual notice of the '098 patent and '926 patent in March 2013.

160.    Upon information and belief, between receiving actual notice of patents in the same family as the '098 patent, receiving actual notice of the patent application that a mere three months later became the '837 patent, as well as working with Milestone to develop video management software beginning in 2014 to 2015, Siemens has been aware of the '098 patent and '926 patent since at least 2014.

161.    The '616 patent, '984 patent, '314 patent and '870 patent are in the same patent family as the '098 patent and '626 patent. All the Asserted Patents relate to systems and methods for using integrated cameras, sensor networks, and other data sources with a correlation engine that correlates two or more events weighted by the attribute data of the data sources.

162.    Upon information and belief, Siemens long-time involvement in the security industry as well as its work in developing security video management software as well as its notice of the patent family and work with Milestone would have made Siemens aware of the '616 patent, '984 patent, '314 patent and '870 patent as they issued.

163.    Accordingly, Siemens has willfully infringed each of the Asserted Patents.

## **Prayer for Relief**

WHEREFORE, Plaintiff SecureNet Solutions Group, LLC respectfully requests that this Court enter:

A.    A judgment in favor of Plaintiff that Defendant has infringed, either literally and/or under the doctrine of equivalents and either directly or indirectly, U.S. Patent Nos. 7,737,837, 8,130,098, 8,354,926, 9,344,616, 9,619,984, 11,323,314, and 11,929,870.

B.    A permanent injunction enjoining Defendant from committing further acts that infringe upon the Asserted Patents;

C.    A judgment and order requiring Defendant to pay Plaintiff its damages, costs, expenses, and prejudgment and post-judgment interest for its infringement of the Asserted Patents, as provided under 35 U.S.C. § 284;

D.    A judgment and order requiring Defendant to provide an accounting and to pay supplemental damages to Plaintiff, including without limitation, pre-judgment and post-judgment interest;

E.    A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285, including that the Defendant has willfully infringed the Asserted Patents and awarding to Plaintiff its reasonable attorneys' fees against Defendant;

F.    A post-verdict accounting; and

G.    Any and all other relief as the Court may deem appropriate and just under the circumstances.

## **Demand for Jury Trial**

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

DATED this 2nd day of February 2026.

Respectfully submitted,

MICHAEL BEST & FRIEDRICH LLP


*s/Albert Bianchi, Jr.*
Albert Bianchi, Jr. (6292391)
Jon R. Trembath *(pending pro hac vice)*
One South Pinckney Street, Suite 700
Madison, WI 53703
Telephone: 608.257.3501
Facsimile: 608.283.2275
aj.bianchi@michaelbest.com
jrtrembath@michaelbest.com

*Attorneys for Plaintiff*