**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SECURENET SOLUTIONS GROUP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SIEMENS INDUSTRY, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 26 C 1149<br><br>Judge Sara L. Ellis |

**OPINION AND ORDER**

On February 2, 2026, SecureNet Solutions Group, LLC ("SecureNet") filed this patent infringement lawsuit against Siemens Industry, Inc. ("Siemens"), claiming that Siemens has infringed on its patents relating to smart surveillance systems. SecureNet specifically alleges that Siemens has directly or indirectly infringed claim 27 of U.S. Patent No. 8,730,040 (the "'040 patent"); claim 48 of U.S. Patent No. 9,344,616 (the "'616 patent"); claims 10 and 22 of U.S. Patent No. 9,619,984 (the "'984 patent"); claim 20 of U.S. Patent No. 10,020,987 (the "'987 patent"); claims 11, 13, and 14 of U.S. Patent No. 10,587,460 (the "'460 patent"); claims 16 and 26 of U.S. Patent No. 10,862,744 (the "'744 patent"); claims 13 and 21 of U.S. Patent No. 11,323,314 (the "'314 patent"); claim 1 of U.S. Patent No. 11,929,870 (the "'870 patent"); and claim 17 of U.S. Patent No. 12,375,342 (the "'342 patent") (collectively, the "Asserted Patents"). Siemens now moves to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that the asserted claims are ineligible for patenting under 35 U.S.C. § 101 because they are directed to an abstract idea. Although the Court finds that the Asserted Patents are drawn to abstract ideas, factual disputes ultimately require this Court to deny Siemens' motion to dismiss.

## BACKGROUND[1]

### I. Smart Surveillance Systems

The Asserted Patents relate generally to smart surveillance systems. Smart surveillance systems "use automatic image understanding techniques to extract information" from surveillance data. Doc. 21 ¶ 8. By 2007, the priority date of the Asserted Patents, smart surveillance systems had begun gaining commercial popularity and replacing traditional security systems. The smart surveillance systems that came before the Asserted Patents allowed security guards to monitor locations and issue alerts in a more accurate and timely manner because guards no longer needed to rely solely on their visual perception of a display monitor. But these prior smart surveillance systems also struggled to keep up with the "explosion of information" that came along with the "move to digital surveillance infrastructure." *Id.* ¶¶ 8–10; *see also id.* ¶ 10 ("The systems were receiving too many inputs, too quickly, in too many incompatible formats to make meaningful distinctions between routine and suspicious activity."). This information explosion resulted in "a flood of false alarms and missed detections that rendered these systems unreliable." *Id.* ¶ 10.

### II. The Asserted Patents

The inventions claimed in SecureNet's Asserted Patents address the overwhelming amount of data produced by the proliferation of cameras, sensors, and networked monitoring devices by improving how computer systems process and evaluate data. The inventions recite a

---

[1] The Court takes the facts in the background section from SecureNet's complaint and the exhibits attached thereto and presumes them to be true for the purpose of resolving Siemens' motions to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

specific combination of event analysis, normalization, attribute weighting, correlation across time and space, rule evaluation against enriched event records, and hierarchical storage management that changes how the surveillance system itself processes data. The Asserted Patents' specification describes how the inventions can override and correct human judgment "through machine-executed probabilistic weighting and correlation of heterogeneous sensor data based on attributable data about the sensor that is not discernable to the human eye, nor readily available to a security guard." *Id.* ¶ 13. For example, the inventions use a particular computerized process to connect crime-related events to specific sensor data, legacy system data, 911 calls, anonymous tips, and video records, reducing errors and false positives.

## III. Alleged Infringement

Siemens offers a comprehensive range of security solutions and systems. SecureNet claims that multiple Siemens products infringe on the Asserted Patents, including Siemens' Siveillance Suite, which includes the Siveillance Control and Siveillance Control Pro platforms used with Siveillance Video Advanced or Siveillance Video Pro, and any Siemens product that white-labels video-management software or services from Milestone Systems, Inc.[2] Siveillance Suite links data from various sensors, storage, analytics, and services to enable its customers to deploy systems and methods that allegedly practice SecureNet's claimed inventions. Siemens also sells Milestone Systems, Inc.'s XProtect products and add-on analytics programs, such as BriefCam and Viisights, which operate similarly to Siemens' Siveillance video software.

---

[2] SecureNet specifically claims that Siemens' infringing products include, but are not limited to: Siemens Siveillance Suite, which includes Siveillance Control or Siveillance Control Pro used with Siveillance Video Advanced or Siveillance Video Pro, any Siemens product that white-labels Milestone Systems, Inc.'s video management system or services, or any other video management system, product, or service, for which Siemens serves as an integrator or as a service provider that are substantially similar and include a video content analytics software or plug-in (collectively, the "Accused Products").

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

Section 101 of the Patent Act defines patentable subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. This provision, however, "contains an important implicit exception[:] Laws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc*, 569 U.S. 576, 589 (2013) (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 70 (2012)). At issue here is the abstract ideas exception.

To determine whether a patent claims eligible subject matter, the Court must engage in the two-step analysis established by the Supreme Court in *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014). At step one, the Court must "determine whether the claims

at issue are directed to a patent-ineligible concept," including abstract ideas. *Id.* at 218. Then, at step two, the Court "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (citation omitted). Whether a claim recites patent-eligible subject matter pursuant to Section 101 is an issue of law, *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), and the Federal Circuit has confirmed "that patent eligibility can be determined at the Rule 12(b)(6) stage," *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) (citations omitted).[3]

### A. Step One

The Court begins its analysis at step one, determining whether the asserted claims "are directed to a patent-ineligible concept." *Alice*, 573 U.S. at 218. To do so, the Court "evaluate[s] 'the focus of the claimed advance over the prior art to determine if the claim's character as a whole is directed to excluded subject matter.'" *Trs. of Columbia Univ. in City of N.Y. v. Gen Digit. Inc.*, 169 F.4th 1320, 1328–29 (Fed. Cir. 2026) (quoting *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1361 (Fed. Cir. 2023)). "This requires 'an accurate characterization of what the claims require and of what the patent asserts to be the claimed advance.' *Id.* at 1329 (quoting *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294 (Fed. Cir. 2020)). Although the specification is relevant to the construction of the claims, 'reliance on the specification must always yield to the claim language in identifying that focus.'" *Id.* (quoting *Trinity*, 72 F.4th at 1361) (collecting cases).

---

[3] If claim construction disputes exist at the Rule 12(b)(6) stage, however, the Court must either adopt the non-moving party's constructions or resolve the disputes to whatever extent needed to conduct the Section 101 analysis. *Id.* at 1125 (citations omitted). Here, the Court can evaluate the asserted patents' eligibility without resolving any potential disputes over the construction of the asserted claims.

Here, the asserted claims are directed to (1) capturing sensory data from one or more sensors, (2) storing the data in a data storage device, (3) processing the data to detect primitive events, (4) correlating the primitive events, and (5) performing one or more actions based on the analysis. Doc. 21-2 at Abstract, claim 27; Doc. 21-3 at Abstract, claim 48; Doc. 21-4 at Abstract, claims 10 and 22; Doc. 21-5 at Abstract, claim 20; Doc. 21-6 at Abstract, claims 11, 13, and 14; Doc. 21-7 at Abstract, claims 16 and 26; Doc. 21-8 at Abstract, claims 13 and 21; Doc. 21-9 at Abstract, claim 1; Doc. 21-10 at Abstract, claim 17; *see also SecureNet Sols. Grp., LLC v. Senstar Corp.*, No. 19-CV-2913, 2020 WL 2557625, at *10 (D. Colo. May 20, 2020) (applying step one of *Alice* test to claims from the same patent family and concluding that they were "directed to (1) collecting data from sensors, (2) storing the data in storage devices, (3) analyzing the data, and (4) providing an output—or an 'alert' to be acted upon").[4]

Given this focus, the Court agrees with SecureNet that the asserted claims are directed to an abstract idea. While neither the Supreme Court nor the Federal Circuit have "established a definitive rule to determine what constitutes an 'abstract idea' sufficient to satisfy the first step of the *Mayo/Alice* inquiry," both "have found it sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). As relevant here, the Federal Circuit has made clear that claims focused on "collecting information, analyzing it, and displaying certain results of the collection and analysis" are directed to an abstract idea. *Elec. Power Grp., LLC v. Alstom*

---

[4] The Court agrees with Siemens that the asserted claims all focus on the same general idea and can be analyzed together. *See Senstar*, 2020 WL 2557625, at *7 (agreeing that patents from same family were "substantially similar and are linked to the same general idea" and concluding that, "in making the analysis of patent ineligibility under § 101, [the court] need not address each claim of each patent separately").

*S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (collecting cases). "So, too, is 'analyzing information . . . by mathematical algorithms, without more.'" *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) (citation omitted).

For example, in *Chewy, Inc. v. International Business Machines Corp.*, the Federal Circuit held that claims reciting a method of "obtaining search results from [an internet] user's search query" and "correlating advertisements with search results using a generic process" were directed towards an abstract idea. 94 F.4th 1354, 1365 (Fed. Cir. 2024). And in *Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*, the Federal Circuit similarly held that the asserted claim was directed to "an abstract idea because it describes a process of organizing information through mathematical correlations and is not tied to a specific structure or machine." 758 F.3d 1344, 1350 (Fed. Cir. 2014). The Federal Circuit explained:

> The above claim recites a process of taking two data sets and combining them into a single data set, the device profile. The two data sets are generated by taking existing information . . . and organizing this information into a new form. . . . As discussed above, the two data sets and the resulting device profile are ineligible subject matter. Without additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible.

*Id.*; *see also Broadcom Corp. v. Netflix Inc.*, 677 F. Supp. 3d 1010, 1021 (N.D. Cal. 2023) ("The abstract idea of collecting and correlating data is a common one in human enterprise and experience. Without more, namely without some specific, concrete innovation, the idea remains abstract.").

Here, too, the asserted claims are directed at the abstract idea of collecting and correlating data from sensors, using conventional technology as a tool. As SecureNet admits in its response, the prior smart surveillance systems simply "corrected and improved upon what a human

security guard could accomplish using pen and paper or mental processes based only on the guard's review of surroundings observable by the naked eye in a dumb terminal." Doc. 34 at 2. The asserted claims simply take that abstract idea one step further, using existing technology to store, correlate, and act upon sensory data. The claimed invention is not directed at improving the hardware used during this process; indeed, the specification expressly disclaims any limitations regarding the hardware used. *See* Doc. 21-8 at 37:51–56 ("[T]he present invention is not limited to the particular hardware shown or described."); Doc. 34 at 4 ("[T]he patented invention is not limited to any specific hardware architecture."). While that would not be fatal if the asserted claims "recite[d] a sufficiently specific implementation" of that existing hardware, *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1151 (Fed. Cir. 2019), they fall far short of doing so. Rather, the asserted claims simply recite the data storage, correlation, and alert processes in generic, functional terms. *Compare* Doc. 21-8 at 47:18–59, 49:33–50:34 (requiring the hardware processor to "receive," "store," and "evaluate" sensory events and "send one or more alerts" based on the critical events), *with Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337–38 (Fed. Cir. 2017) (finding abstract a claim that "requires the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but does not sufficiently describe how to achieve these results in a non-abstract way").

While SecureNet argues that this characterization of the asserted claims is too narrow and that the claimed invention is "an improved and enhanced" smart surveillance system, Doc. 32 at 10–11, this argument is not persuasive. Initially, the Court notes that nothing in the language of the asserted claims indicates that their focus is on this alleged improvement, nor do the claims require the specific "ordered computational process" that SecureNet argues results in this

technical improvement. *Compare* Doc. 34 at 11 ("The patented invention, as set forth in the patents' claims, addressed that problem with an ordered computational process for the correlation engine or module[.]"), *with* Doc. 21-8 at 47:8–10 ("[T]he order and grouping of the operations is not a limitation of the present invention."); *see also* Doc. 21-2 at claim 27; Doc. 21-3 at claim 48; Doc. 21-4 at claims 10 and 22; Doc. 21-5 at claim 20; Doc. 21-6 at claims 11, 13, and 14; Doc. 21-7 at claims 16 and 26; Doc. 21-8 at claims 13 and 21; Doc. 21-9 at claim 1; Doc. 21-10 at claim 17. Without any language in the claims to support this argument, it falls flat. *Trs. of Columbia Univ.*, 169 F.4th at 1331 ("It cannot be said that the claims are directed to a technological improvement when nothing in the claims requires the steps necessary to make the improvement."); *GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1061 (Fed. Cir. 2026) ("[O]nly features that are claimed, not unclaimed details that appear in the specification, can supply something beyond ineligible matter—here, something beyond an abstract idea and sufficient to render the claim eligible.").

Even if the asserted claims were directed to improving the prior smart surveillance systems, however, they would still not be patent-eligible. "An improved result, without more stated in the claim, is not enough to confer eligibility to an otherwise abstract idea." *Koninklijke*, 942 F.3d at 1150 (citation omitted). Thus, while the Federal Circuit has "found software inventions to be patent-eligible where they have made non-abstract improvements to existing technological processes and computer technology," this requires the claims to "recite a specific solution for accomplishing that goal." *Id.* at 1150–51. "[I]t is not enough . . . to merely improve a fundamental practice or abstract process by invoking a computer merely as a tool." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1364 (Fed. Cir. 2020); *see also* *Trs. of Columbia Univ.*, 169 F.4th at 1329 ("[T]he use of 'conventional or generic technology'

cannot alone constitute a technological improvement."). And here, the asserted claims do just that. Rather than reciting "*how* the purported invention improved the functionality of a computer," they recite the claimed invention "at such a level of result-oriented generality" that it amounts to the "mere implementation of an abstract idea on a computer, not the specific way to improve the functionality of a computer." *Koninklijke*, 942 F.3d at 1152; *see also Trs. of Columbia Univ.*, 169 F.4th at 1330 (holding that the use of "conventional technology . . . is an abstract idea" and that any "efficiency gain from the use of multiple computers is no more than this concededly abstract idea"); *Customedia*, 951 F.3d at 1365 ("The only improvements identified in the specification are generic speed and efficiency improvements inherent in applying the use of a computer to any task. Therefore, the claimed invention is at most an improvement to the abstract concept of targeted advertising wherein a computer is merely used as a tool. This is not an improvement in the functioning of the computer itself.").

SecureNet also argues that "the correlation engine is not merely collecting information" but instead "creates a wholly new and structurally distinct data type, which is a technological improvement over prior art." Doc. 34 at 15; *see also id.* ("This correlated event is enriched data, not a mere label on existing data[.]"). The Court is again unpersuaded by this argument. Not only does SecureNet provide no authority to support the proposition that this somehow renders the asserted claims patent-eligible, but the Federal Circuit has expressly found that "[a] process that started with data, added an algorithm, and ended with a new form of data was directed to an abstract idea." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) (citation omitted); *see also Digitech*, 758 F.3d at 1351 ("The two data sets are generated by taking existing information . . . and organizing this information into a new form. The above claim thus recites an ineligible abstract process[.]"); *Burnett v. Panasonic Corp.*, 741 F. App'x

777, 781 (Fed. Cir. 2018) (finding that the "process of mathematically converting the data into a new form" was directed to an abstract idea).

Next, SecureNet points to claim limitations present in some of the asserted claims, including the weighting of data, the use of a hierarchical storage management system, and/or the monitoring of network status, arguing that these "unconventional technical solution[s]" are "enough to support subject-matter eligibility." Doc. 34 at 17–18. These arguments, however, are more appropriate for the step two analysis. *Burnett*, 741 F. App'x at 781 (arguments regarding "whether additional features in a claim transform an otherwise a patent-ineligible concept into a patent-eligible concept" are "more appropriately assessed under our inquiry in step two"); *Senstar*, 2020 WL 2557625, at *11 ("If anything, the hierarchical storage management system and the weighting of attribute data from the sensors to reduce errors rates should be considered at step two of the *Alice* analysis.").

For these reasons, the Court finds that the asserted claims are directed to an abstract idea and turns to the second step of the *Alice* analysis.[5]

**B. Step Two**

At the second step of the *Alice* analysis, the Court must "determine whether the claims do significantly more than simply describe [the] abstract method" and thus transform the abstract idea into a patentable subject matter. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014). A court applying step two looks to see whether there are any "additional features" in the claims that constitute an "inventive concept" thereby rendering the claims eligible for

[5] This Court is not alone in reaching this conclusion. In *Senstar*, the district court similarly found that patents in the Asserted Patents' family were directed to an abstract idea because they "appear[ed] to be merely an effort to computerize and analyze more quickly, and perhaps with more precision, that which humans, for example security guards or retail salespeople, have always done." 2020 WL 2557625, at *10.

patenting even if they are directed to an abstract idea. *Alice*, 573 U.S. at 221. Those "additional features" must be more than "well-understood, routine, conventional activity." *Mayo*, 566 U.S. at 78; *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016). A claim that simply recites the use of "generic features," such as storage medium or a graphical user interface, as well as "routine functions," such as transmitting and receiving signals, to implement the underlying idea does not pass the second step. *Affinity Labs*, 838 F.3d at 1262–63. More generally, simply appending "conventional steps specified at a high level of generality" to an abstract idea does not make that idea patentable. *Id.* (quoting *Mayo*, 566 U.S. at 82). Instead, the claims of the patents must include "additional substantive limitations . . . [that] narrow, confine, or otherwise tie down the claim so that, in practical terms, it does not cover the full abstract idea itself." *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. 2013) (quoting *CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1282 (Fed. Cir. 2013)).

Siemens argues that the asserted claims add nothing beyond "merely implement[ing] the abstract idea using conventional data-processing steps" such as receiving, normalizing, storing, analyzing, and outputting information. Doc. 28 at 20. But SecureNet contends that its amended complaint plausibly and concretely alleges that the Asserted Patents' claims recite "a non-conventional, ordered combination of components and processes that improve[ ] the operation of the surveillance system itself—not merely a generic computer performing ordinary data analysis." Doc. 34 at 20 (citing Doc. 21 ¶¶ 11–13, 18–22, 32, 59–70). Specifically, SecureNet highlights (1) the sensory event analytics module that receives and processes sensory data to detect specific event types (all asserted claims); (2) the hierarchical storage manager that manages, stores, and cascades based on sensory events ('744 patent, claim 26; '314 patent,

claims 13 and 21; ’342 patent, claim 17); (3) the correlation module or correlation engine that evaluates historical correlations across time and space (’460 patent, claim 11; ’744 patent, claims 16 and 26; ’314 patent, claims 13 and 21;’870 patent, claim 1; ’342 patent, claim 17); (4) the weighting of sensory events based on attribute data (’460 patent, claim 11; ’744 patent, claim 16; ’314 patent, claim 13; ’870 patent, claim 1); and (5) the communication that occurs over an IP network (’460 patent, claim 11; ’314 patent, claims 13 and 21). *Id.* at 21. SecureNet insists that these limitations, taken together, delineate specific steps and components that provide unconventional improvements to surveillance technology. Siemens responds by arguing, among other things, that the hierarchical storage management and correlation processes fail to save SecureNet’s patent because “[m]erely requiring the selection and manipulation of information—to provide a ‘humanly comprehensible’ amount of information useful for users—does not transform the otherwise-abstract processes of information collection and analysis.” Doc. 36 at 10 (quoting *Elec. Power Grp.*, 830 F.3d at 1355).

But importantly, “[w]hether the claim elements or the claimed combination are well-understood, routine, [or] conventional is a question of fact.” *Aatrix*, 882 F.3d at 1128. Other district courts considering this patent family and analyzing *Alice* step two have concluded that factual issues bar a finding of patent ineligibility at this early stage of litigation. *See SecureNet Sols. Grp., LLC v. Arrow Elecs., Inc.*, No. 22-CV-1254, 2023 WL 3821214, at *11 (D. Colo. June 5, 2023) (denying motion for judgment on the pleadings because the asserted claims, which include limitations on weighting, hierarchical storage, and correlation of historical data across time and space, involve factual issues that precluded a finding of patent ineligibility); *Senstar*, 2020 WL 2557625 (denying motion to dismiss because the asserted patents’ eligibility depended on factual issues and reiterating that the court must rely on the complaint and draw all reasonable

inferences in SecureNet's favor). Siemens contends that no factual disputes exist here because "the patents concede that the claim-recited components encompass generic components[,] not unconventional technological advances." Doc. 28 at 25. But in support of this argument, Siemens only cites to a table—that it created—summarizing the asserted claims and their purportedly generic components. *Id.* at 21.[6] Siemens does not otherwise distinguish this case from the facts of the two other related cases. Accordingly, the Court finds the reasoning in *Senstar* and *Arrow* persuasive and concludes that factual issues bar a finding of patent ineligibility at the motion to dismiss stage. *See Arrow*, 2023 WL 3821214, at *10–11; *Senstar*, 2020 WL 2557625, at *11–12.

## CONCLUSION

For the foregoing reasons, the Court denies Siemens' motion to dismiss [28].

Dated: October 30, 2026

SARA L. ELLIS
United States District Judge

[6] Siemens cites to a table on page 2 of its brief, but this table concerns the Asserted Patents' specifications. The Court believes this citation is a scrivener's error and assumes that Siemens instead intended to cite to its table on page 21, referencing SecureNet's asserted claims and their generic components.